UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RAYMOND E. HUMPHREY,**

    **Plaintiff,**                                Case No. 2:04-cv-312
                                                          **JUDGE GREGORY L. FROST**
    **v.**                                             Magistrate Judge Terence P. Kemp

**OFFICER DWAYNE M. MABRY, et al.,**

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings:

(1) Plaintiff's motion for partial summary judgment against Defendants Duane M. Mabry and Kevin George (Doc. # 20), Plaintiff's motion for partial summary judgment against Defendant Kevin Wheeler (Doc. # 21), and Defendants' combined memorandum in opposition to both motions (Doc. # 28); and

(2) Defendants' motion for summary judgment (Doc. # 26), Plaintiff's memorandum in opposition (Doc. # 35), and Defendants' reply memorandum (Doc. # 36).

For the reasons that follow, the Court **GRANTS** Plaintiff's motions (Docs. # 20, 21) and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion (Doc. # 26).

### I. Background

On December 10, 2002, the City of Columbus police received a 911 call that an armed individual had attempted to shoot another man before fleeing in a car. The dispatcher issued a description of the individual sought and of his car, a grey PT Cruiser. The initial description

1

failed to give the correct suspect's name and license plate number. Based on this information, officers began to search for the vehicle, including officer Kevin Wheeler, who was in a police department helicopter.

Wheeler radioed from the helicopter that he had spotted a grey PT Cruiser in the general area of the 911 incident. City of Columbus police officers Duane M. Mabry and Kevin George were patrolling the south side of Columbus on bicycle when, at about 10:35 p.m., they received the information that the PT Cruiser headed in their direction was wanted in connection with an investigation into a gun-related incident. They observed that the helicopter was following the car, which passed several police cruisers. Cognizant that the license plate information received earlier was incorrect, Mabry and George walked into the street and stopped traffic. They then drew their guns and approached the PT Cruiser.

The stopped PT Cruiser–which was blue, not grey–was being driven by Plaintiff, Raymond E. Humphrey, who was on his way home from work. Mabry ordered Humphrey to place his hands in the air and to exit the car. Mabry then holstered his firearm as Humphrey complied with the orders. Mabry proceeded to conduct a pat down of Humphrey, placing Humphrey's hands behind his back.

Another officer present provided a description of the suspect. The description the officers received indicated that the suspect was a nineteen-year-old, light-complected African-American male named Gregory Dunson, approximately six-foot-one and two-hundred and fifteen pounds, who was wearing a Cincinnati Reds shirt, black jacket, a hat, and wire-framed glasses, with short curly hair and a goatee. Humphrey, at the time of the incident, was 52-years old with a dark complexion, is five feet six inches tall, and weighed approximately 160 pounds.

He was not wearing a sports-team shirt, glasses, or a hat. Mabry therefore terminated the pat down and attempted to explain the confusion to Humphrey. The entire incident lasted anywhere from 51 seconds to just under five minutes.

Humphrey subsequently filed this action on April 23, 2004 against Mabry, George, Wheeler, the City of Columbus, and six John Doe officers. (Doc. # 1.) Via an amended complaint, he asserts claims under 42 U.S.C. § 1983 for unlawful search and seizure, excessive force, conspiracy to deprive him of his constitutional rights, failure to train, supervise, and discipline police officers, and ratification of improper police conduct. (Doc. # 13.) All the parties have moved for partial or full summary judgment, and the motions are now ripe for adjudication. (Docs. # 20, 21, 26.)

## II.  Discussion

### A.  Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the

3

nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

   **B. Analysis**

   Humphrey asserts federal claims under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

Thus, in order to prevail on his § 1983 claims, Humphrey must show that, while acting under color of state law, Defendants deprived him of a right secured by the Federal Constitution or laws of the United States. *See Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992). This Court shall address each asserted violation of Humphrey's rights in turn.

   *1. Search and Seizure*

   Humphrey contends that Defendants violated his constitutional rights by seizing and searching his person without probable cause for doing so. Defendants, however, respond to

these claims by arguing that they had reasonable suspicion supporting their actions and by attempting to invoke the doctrine of qualified immunity.

The qualified immunity doctrine, under certain circumstances, operates to shield from civil liability governmental officials who are performing official duties. *Sinick v. County of Summit*, 76 Fed. Appx. 675, 678-79 (6th Cir. 2003). To determine whether such immunity from suit applies, a court must ask:

> 1) has a constitutional violation occurred; 2) was that right a clearly established right of which a reasonable person would have known; and 3) has the plaintiff alleged sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights"?

*Id*. at 679 (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). Therefore, the Court will begin its analysis by examining whether a constitutional violation has occurred.

The Sixth Circuit has explained:

> The Fourth Amendment, applicable to the states through the Fourteenth Amendment, guarantees that the "right of the people to be secure in their persons, [and] houses ..., against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. The "basic purpose of this Amendment ... is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Ct. of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

*Sargent v. City of Toledo Police Dept.*, No. 04-4143, 2005 WL 2470830, at *2 (6th Cir. Oct. 6, 2005). It is well settled that "police officers are insulated from a § 1983 action for illegal search and seizure if a warrant has been obtained, unless the warrant application is so lacking in indicia of probable cause that official belief in the existence of probable cause is unreasonable." *Packer v. City of Toledo*, 1 Fed. Appx. 430, 433 (6th Cir. 2001). In instances where no warrant is

5

involved, a search and seizure is presumptively unreasonable unless one of the few specifically established and well-delineated exceptions, such as consent, applies. *United States v. Baldwin*, 114 Fed Appx. 675, 678 (6th Cir. 2004). *See also Toles v. Friedman*, 238 F.3d 424, 2000 WL 1871683, at *4 (unpublished table decision) (identifying exceptions and setting forth supporting cases); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994) (same). The Sixth Circuit has discussed another specific exception:

> A warrantless seizure may be justified as a product of a brief investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To justify a *Terry* stop, an officer must point to specific, articulable facts which gave rise to a "reasonable suspicion" that the suspect was engaged in criminal activity. *Terry,* 392 U.S. at 21. A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

*Baldwin*, 114 Fed. Appx. at 679. The extant question is this whether the totality of the circumstances of this case present specific, articulable facts that gave rise to a reasonable suspicion that Humphrey was engaged in criminal activity so as to permit the search and seizure that occurred.

At the time of Humphrey's search and seizure, neither Mabry nor George had a description of the individual they were seeking other than simply that he was a black male. (Mabry Dep. at 13, 22; George Dep. at 19-20, 25-26, 34-35.) Both officers testified that they did not observe Humphrey commit a crime, that they did not know what specific crime with which he was potentially involved, and that they stopped Humphrey simply because Wheeler, in the helicopter, told them that Humphrey's PT Cruiser was the vehicle with the gun inside for which

6

officers were looking. (Mabry Dep. at 9, 11-12, 17, 26-27; George Dep. at 14-15, 19-20, 31-32.) Mabry and George also testified that prior to the helicopter communication, they simply knew that the vehicle sought was a dark-colored PT Cruiser with a male black driver and with a gun inside. (Mabry Dep. at 18; George Dep. at 15, 18.) Neither officer testified as to the existence of any exigent circumstances, such a furtive movement by Humphrey. Rather, both officers confirmed that they simply stopped the car at the direction of the helicopter officer, that they knew they were looking for a black male, and that they knew that a gun was involved and might be in the vehicle.

Wheeler, the observer officer in the helicopter, testified at his deposition that he informed Mabry and George that Humphrey's PT Cruiser was the one involved in the gun-related incident. (Wheeler Dep. at 12-14, 25.) He confirmed that he identified Humphrey's blue PT Cruiser as a grey vehicle (Wheeler Dep. at 16, 23), but stated that he did not have any information about the driver (Wheeler Dep. at 24-26, 28-29). Wheeler did not recall having heard many of the earlier radio reports about the "gun run" incident and did not know the circumstances of the underlying crime. (Wheeler Dep. at 18-19, 21.) He also testified that no officer had told him that Humphrey's car was the vehicle involved in the gun run. (Wheeler Dep. at 26-27.)

The foregoing presents a scenario in which incomplete information and an error as to the color of Humphrey's car led to the search and seizure. Wheeler mistakenly identified the car as the one involved in the gun run, and Mabry and Humphrey relied on this identification to effectuate the stop. Humphrey argues that all three officers lacked a reasonable, articulable suspicion that he was involved in criminal activity. Although conceding that police officers must be able to rely upon the direction of another officer to seize an individual when urgency

7

necessitates it, Humphrey asserts that the facts of his case present a distinguishable scenario because the officer who issued the seizure directive–Wheeler–lacked knowledge of whether the occupant of the PT Cruiser had committed any crime. All Wheeler knew was that he was looking for a grey PT Cruiser in connection with a "gun run."

At the time of the seizure, officers had been told that the actual (later apprehended) suspect had abandoned his car, was on foot, and had the gun on his person. The police also knew that a different person than the actual suspect had driven away from the alleged crime scene in a grey PT Cruiser, headed in the opposite direction from the direction taken by the suspect. The evidence submitted indicates that the police dispatcher correctly radioed this information to officers. Review of the taped 911 call and police transmissions also reveals, however, that within minutes of the initial information being reported, the police transmissions became inexplicably confused. An officer and the dispatcher soon advised that the armed suspect was in the PT Cruiser, without any apparent basis for doing so.[1] Within minutes, that same officer then clarified that the suspect was not in the vehicle but was on foot. The gun was said to possibly be in the car, which officers recognized was *not* being driven by the suspect. After several more minutes, it was broadcast that the suspect *was* in the PT Cruiser. When Humphrey's car was spotted by the helicopter, an officer advised that the car contained the gun.

Defendants' argument that the collective knowledge of the police excuses the search and

---

[1] The affidavit testimony of Columbus police officer Mark Smith, who aired the report that the suspect had been seen in a grey PT Cruiser, fails to support the search and seizure involved here because it does not credit the specific source of his information so as to create reasonable, articulable suspicion and because it presents an unwarranted, unsubstantiated inference. (Doc. # 30, Ex. 4, Smith Aff. at 4, ¶ 17-19.) Officer Russell's report that the gun was in the PT Cruiser is similarly uncredited and underdeveloped. (Doc. # 30, Ex. 1, Mabry Aff., at 2 ¶ 9; Ex. 5, Wheeler Aff., at 3 ¶ 19-20.)

seizure not only fails to persuade, but it also condemns. The officers' collective knowledge indicates that no reasonable, articulable suspicion could attach to any PT Cruiser driver in relation to the underlying crime. *See Feathers v. Aey*, 319 F.3d 848, 849 (6th Cir. 2003) (dispatcher information relied upon by officers effectuating seizure must be based on sufficient information to satisfy the reasonable, articulable suspicion standard). Instead, a reasonable jury could only conclude based on the totality of the circumstances that erroneous and impermissible conjecture–and outright confusion–prompted the search and seizure involved here.

The Court concludes that no reasonable jury could find against Humphrey and for Defendants on his unlawful search and seizure claims. Additionally, this predicate deprivation of Humphrey's constitutional rights involves clearly established rights of which a reasonable person would have known at the time of the incident, and Humphrey has alleged sufficient evidence indicating that the officers' mistaken actions were objectively unreasonable in light of these clearly established constitutional rights. *See Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (recognizing that the "Fourth Amendment rights to be free from unreasonable searches and seizures ... are clearly established rights of which a reasonable official would know"). The collective knowledge of the police and the lack of information upon which the officers involved relied compel this Court to conclude that qualified immunity cannot excuse the officers in their individual capacity here.

The Court **DENIES** Defendant's motion for summary judgment on these claims (Doc. # 26), but **GRANTS** Humphrey's motions for summary judgment on the unlawful search and seizure claims (Doc. # 20, 21).

    2. *Use of Force*

Humphrey has also alleged a § 1983 violation for excessive force. He asserts this cause of action against the officers in both their official and individual capacities. Defendants move for summary judgment on the grounds that the amount of force involved here was reasonable, thereby precluding any deprivation of a constitutional right, and on the grounds that the officers in their individual capacities are entitled to qualified immunity.

The Court therefore asks first whether Humphrey has alleged a violation of a constitutionally protected right and, second, whether the right was clearly established at the time of the alleged violation. *See D'Agastino*, 75 Fed. Appx. at 993. It must be clear to a reasonable officer facing the specific factual situation before the defendant officers here that the force involved in effectuating the seizure of Humphrey was excessive. *See id*. at 994.

The United States Supreme Court clearly established prior to these events that the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. *See, e.g., Graham*, 490 U.S. at 394-95. *See also Pray*, 49 F.3d at 1158. It was also well settled at the time of these events that the use of force must be reasonable; if no force was required, then no force was permitted. *See id*. at 395; *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). *See also Adams v. Metiva,* 31 F.3d 375, 384-85 (6th Cir.1994).

A determination of whether the force used to effect a seizure was unreasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ewolski v. City of Brunswick*, 287 F.3d 492, 507-08 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). *See also D'Agastino*, 75 Fed. Appx. at 994. The "objective reasonableness standard"

applied in this inquiry asks whether a reasonable officer would conclude that the level of force used was appropriate. *Graham*, 490 U.S. at 396-97. This standard balances the cost to the individual against the government's interest in effectuating a seizure; it contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396 ). The officer's subjective intentions are irrelevant to a Fourth Amendment inquiry. *Graham*, 490 U.S. at 397. Generally, the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. *Id.* Thus, the use of force involved here was objectively unreasonable if it would have been clear to a reasonable officer in this situation that the level of force used against Humphrey was excessive.

      The Sixth Circuit has cautioned that "[s]ummary judgement on a claim of excessive force is inappropriate where the parties dispute virtually all of the essential facts surrounding the excessive force claim because it impossible to determine whether the force used was reasonable without choosing between the parties sharply different factual accounts." *Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991). This case does not present such a scenario. Rather, this case presents a factual scenario in which the parties agree on the essential facts.

      The facts reveal that the officers involved applied a meager level of force in a situation that they perceived presented circumstances posing an immediate threat to their safety. Although such context was the result of confusion, mere confusion does not vitiate the reasonableness of the actions taken if the officers' initial actions were proper. Here, Humphrey asserts that after being stopped, an officer (which other testimony identifies as Mabry) reached into his car, seized his left wrist, led him from the vehicle, and began to frisk or pat him down.

(Humphrey Dep. at 143, 146, 149.)  He states that he "may have had the left wrist handcuffed" at that point, but that he could not recall.  (Humphrey Dep. at 148.)  When Humphrey informed the officer that he had an preexisting injury to his right thumb, that officer declined to place Humphrey in handcuffs and instead had another officer hold Humphrey's right hand out. (Humphrey Dep. at 149-50, 153-54.)

There is no evidence that any of these actions were conducted with malice.  Humphrey, in fact, concedes in his deposition that no officer ever physically assaulted him, that no officer ever injured him, and that no officer threatened him.  (Humphrey Dep. at 267.)  Humphrey even specifically denied that the placement of the handcuff on his left wrist physically injured him (Humphrey Dep. at 149) or that the manner in which the second officer held his right arm injured him (Humphrey Dep. at 154).  His interrogatory responses support this testimony, stating that he does not alleged any physical injury.  (Response to Int. No. 8.)  This thus appears to be an excessive force case in which indignity is essentially presented as a substitute for harsh physical mistreatment.

But Humphrey nonetheless has presented an excessive force claim that can survive summary judgment.  The Sixth Circuit has held that the application of force after officers knew or under the circumstances should have known that they were without justification for their actions is impermissible.  *See Pray*, 49 F.3d at 1160-61.  Accordingly, there is no qualified immunity available here, and Defendants are not entitled to summary judgment.

### *3. Conspiracy*

As noted, Humphrey's amended complaint includes an allegation of conspiracy in connection with his first claim under § 1983.  Humphrey neither moves for summary judgment

12

on his conspiracy theory nor responds to Defendants' motion for summary judgment in this regard.

Defendants argue that they are entitled to summary judgment on the conspiracy allegation because Humphrey has failed to present any evidence that a conspiracy exists. Citing to the standard for proving a conspiracy under 42 U.S.C. § 1985(3), Defendants assert that Humphrey must prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*See Vakilian v. Shaw*, 335 F.3d 509, 518–19 (6th Cir. 2003) (citing *United Bhd. of C & J v. Scott,* 463 U.S. 825, 828–29 (1983)). *See also Griffen v. Breckenridge*, 403 U.S. 88, 102–03 (1971); *Bass v. Robinson,* 167 F.3d 1041, 1050 (6th Cir.1999); *Collyer v. Darling,* 98 F.3d 211, 233 (6th Cir. 1996). The Sixth Circuit has described the elements of a civil conspiracy under § 1983 in essentially analogous terms. *See Mettetal v. Vanderbilt University, Legal Dept.*, Nos. 04-5349 & 04-5504, 2005 WL 2108536, at *6 (6th Cir. Sept. 1, 2005) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)) ("A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. ... All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.").

By its very nature, a conspiracy requires that two or more persons or entities conspire. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Edu.*, 926 F.2d 505, 509 (6th Cir.

1991). The intra-corporate conspiracy doctrine provides, however, that employees of a corporation or governmental entity cannot conspire among themselves because they are treated as one entity. *Id.* (citing *Dougherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984)). *See, e.g., Brunson v. City of Dayton*, 163 F. Supp. 2d 919, 927 (S.D. Ohio 2001) (granting motion to dismiss §1985(3) allegation for failure to state a claim upon which relief may be granted because intra-corporate conspiracy doctrine precluded finding of conspiracy). Thus, as a result of the application of the intra-corporate conspiracy doctrine, Humphrey has failed to set forth material facts upon which any reasonable juror could conclude that Defendants engaged in a conspiracy or, even if the intra-corporate conspiracy doctrine were not applicable, that any such conspiracy existed to deprive him of his rights or to conceal any such deprivation. Accordingly, Defendants are entitled to summary judgment on Humphrey's conspiracy claim.

### 4. Failure to Train, Supervise, or Discipline and Ratification

Defendants seek summary judgment on the second claim contained in Humphrey's amended complaint, which alleges that the City of Columbus failed to adequately train, supervise, and discipline it officers. That same claim also asserts ratification as a cause of action.

*Respondeat superior* cannot provide a basis for liability here. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691 (1978). Thus, to satisfy his burden on his failure to train, supervise, and discipline theory, Humphrey must demonstrate the existence of and impropriety of an involved policy. This is because the Sixth Circuit has explained:

> Municipalities are not ... liable for every misdeed of their employees and agents. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible

> under §§ 1983." [*Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978).] This circuit has stated that to satisfy the *Monell* requirements a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987) (adopting the test articulated in *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984) (en banc), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)).

*Garner*, 8 F.3d at 363-64. *See also Sargent*, 2005 WL 2470830, at *4. What constitutes a *Monell* policy, custom, or practice is therefore most often of critical import to § 1983 actions such as the case *sub judice*. The United States Supreme Court has held:

> [T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. ... Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). The Sixth Circuit has discussed this possibility:

> A city may also be liable, in narrow circumstances, for failure to train its officials, if that failure gives rise to a clearly foreseeable violation of constitutional rights reflecting deliberate indifference to them:
>
> > "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."

*Sell v. City of Columbus*, 47 Fed. Appx. 685, 691-92, (6th Cir. 2002) (quoting *City of Canton,* 489 U.S. at 390 ) (footnotes omitted). The ultimate focus "[i]n resolving the issue of a [municpality's] liability, ... must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390.

15

In light of the foregoing standard, the instant case does not present a failure to train, supervise, or discipline claim upon which a reasonable jury could find for Humphrey. Humphrey has failed to point to any city custom, policy, or practice related to a constitutional deprivation. *See Liptak v. City of Niles, Ohio*, 198 F.3d 246, 1999 WL 1045100, at *5 (6th Cir. 1999) (unpublished table decision) (no § 1983 recovery where a plaintiff fails cite to any official city policy or custom). The only evidence in the record, in fact, indicates that the officers involved received proper training, knew their responsibilities, and should have known better than to carry out their duties based on deficient information. Because there is no unfavorable evidence whatsoever as to the type or extent of training administered to city police officers, Humphrey has failed to create a genuine issue of material fact as to whether the city's training amounted to deliberate indifference to the rights of those with whom officers come into contact. *Id.* at *7. Nor does he offer an official declaration of a flawed policy, custom, or practice. *See e.g.*, *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (holding that the testimony of a county jail official established a policy or custom sufficient for § 1983 liability).

Defendants are therefore entitled to summary judgment on the failure to train, supervise, or discipline component of Humphrey's second claim. This leaves the ratification component of his second claim.

Humphrey asserts a § 1983 violation predicated on the City's alleged failure to investigate and discipline its officers–i.e., that by failing to act properly, the City ratified any impropriety involved. Defendants argue that they are entitled to summary judgment because Humphrey has failed to present evidence that the investigation by the City of Columbus into the incident was not meaningful, that the investigation, if flawed, represents official policy or

custom of deliberate indifference, and that the individual defendants are not decisionmakers who can be held personally liable. Humphrey does not move for summary judgment on this aspect of his § 1983 claim.

The Court concludes that Humphrey has failed to satisfy his burden of presenting evidence upon which a jury could find a failure to investigate/discipline or ratification here. The Sixth Circuit Court of Appeals has explained that "[t]he theory underlying these cases is that the municipality's failure to investigate or discipline amounts to a 'ratification' of the officer's conduct." *Dyer v. Casey*, 72 F.3d 129, 1995 WL 712765, at *2 (6th Cir. 1995) (unpublished table decision). That court has also stated that "[i]n the failure to discipline context, it is appropriate to apply the deliberate indifference standard ... to require a showing of a history of widespread abuse that has been ignored by the City." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *City of Canton*, 489 U.S. at 397). *See also Dyer*, 72 F.3d 129, 1995 WL 712765, at *2.

In this action, Humphrey takes issue with the thoroughness of the City's investigation. But he has offered no evidence undercutting that process. In contrast, Defendants have presented uncontested affidavit testimony and records supporting their assertion that a meaningful and appropriate investigation took place. Humphrey, however, has also failed to produce any evidence of other allegedly improper investigations pointing to a history of ignored widespread abuse. Thus, even in light of the underlying predicate constitutional violation that occurred, Humphrey has not presented any evidence that would enable a reasonable jury to conclude that ratification of such misconduct exists. Defendants are therefore also entitled to summary judgment on this claim.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** Humphrey's motions for partial summary judgment (Docs. # 20, 21) in regard to the unlawful search and seizure aspect of his § 1983 claims, **DENIES** Defendants' motion for summary judgment (Doc. # 26) both on that aspect of the case and on the excessive force claims, and **GRANTS** Defendants' motion for summary judgment (Doc. # 26) in regard to the remaining claims.

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE